# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CIVIL NO. 5:06CV46-V

| | |
|---|---|
| PATRICIA V. WEST,<br>    Plaintiff,<br><br>    vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social<br>Security Administration,<br>    Defendant. | )<br>)<br>)<br>)   **MEMORANDUM AND RECOMMENDATION**<br>)<br>)<br>)<br>)<br>)<br>) |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #11) and "Memorandum in Support ..." (document #12), both filed September 25, 2006; and Defendant's "Motion For Summary Judgment" (document #13) and "Memorandum in Support of the Commissioner's Decision" (document #15), both filed November 21, 2006. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

On May 21, 2003, the Plaintiff filed an application for Social Security Disability benefits ("DIB"), alleging she was unable to work as of May 15, 1998, due to a "right winged scapula." The Plaintiff's claim was denied initially and on reconsideration.

Plaintiff requested a hearing, which was held on September 27, 2005, and at which the Plaintiff was represented by her former counsel. On November 3, 2005, the ALJ issued a decision concluding that the Plaintiff was not disabled on or before December 31, 2003, her date last insured. The Plaintiff filed a timely Request for Review of Hearing Decision. On March 9, 2006, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on April 8, 2006, and the parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND

Relevant to the issues raised on appeal, the Plaintiff testified that she was 44 years-old at the time of the hearing; that she had a driver's license; that she had completed high school plus one year of college; that she was right-handed, 5' 8" tall, and weighed 140 pounds; that her two school-age daughters lived with her and that she got them ready for school each morning and drove them to and from school daily; that she was a certified histology technician; that she also had worked as a debt collector at a collections agency; that her last job was as a secretary, which included using a computer and preparing bank deposits; that she quit working due to arm and shoulder problems and the stress of not being able to perform her job properly; that she took only Tylenol for pain; that she performed some household chores, such as sweeping, vacuuming, cooking, and washing dishes; and that she read the Bible and did Bible lessons daily, attended church on Sundays and Wednesdays, and went to PTA meetings.

Concerning her physical limitations, the Plaintiff stated that she could walk a mile; that she could stand for four hours and sit for four hours in an eight-hour workday; but that she could not use

her right arm for pushing, pulling or reaching, although she could reach overhead and use both hands to grasp.

A Vocational Expert ("VE") classified the Plaintiff's prior work experience as light and skilled (histology technician) and light and semi-skilled (debt collector and secretary/clerk), and stated that there were skills transferable from the debt collector and secretary/clerk jobs to other jobs at the light or sedentary exertional levels, including file clerk (7,457 light jobs available in North Carolina), credit clerk (1,789 sedentary jobs available in North Carolina), and telephone answering service operator (2,411 sedentary jobs available in North Carolina).

The ALJ then gave the VE the following hypothetical:

> assume a person of the [Plaintiff's] age, education level, and work experience . Could do light exertional work ... [but] would be restricted based on having problems with the right shoulder ...as far as pushing and pulling ... no more than frequently ... limited to occasional climbing ... bending and stooping, crouching and crawling ... limited to [no more than] frequent reaching ... handling ... [or] fingering ... the jobs that you've named with transferable skills, would she be able to do those jobs [with those limitations]?

(Tr. 76-77.)

The VE testified that with these limitations, the Plaintiff could perform the file clerk and credit clerk jobs, but could not perform the telephone answering service job due to that job's requirement of constant reaching and fingering. The VE also testified that with the same limitations, the Plaintiff could also work as a cashier (28,008 light, unskilled jobs available in North Carolina), mail clerk (1,689 light, unskilled jobs available in North Carolina), and as a receptionist (13,705 sedentary, skilled jobs available in North Carolina).

The ALJ then presented the VE a modified hypothetical as follows:

> with all of the limitations posed in my first hypothetical ... [plus] this hypothetical person would have some difficulty in remembering and carrying out detailed

3

> instructions, but is capable of following simple repetitive tasks for a two-hour period at a time ... pain would also affect ... [the Plaintiff's] mental ability to remember and understand simple instruction[s], however this person could respond appropriately to supervisors, co-workers, [and] the general public [and to a] usual work situation ... could handle [a] routine work setting, changes in routine work setting appropriately, could make simple work-related decision[s], and this person could maintain persistence and pace within workplace norm on a sustained basis, which [of the previously identified jobs] would this person be vocationally qualified to perform?

(Tr. 78-79.)

The VE testified that with these further limitations, the Plaintiff could still perform the cashier and mail clerk jobs.

On August 1, 2003, an Agency medical expert (whose name is unclear in the record) completed a Physical Residual Functional Capacity Assessment, noting that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8-hour workday; that her ability to push and/or pull was unlimited; that the Plaintiff should avoid repetitive reaching overhead; that, otherwise, the Plaintiff had a residual functional capacity ("RFC") for medium work, and that there was no limitation on the Plaintiff's ability to perform secretarial or other sedentary work.

On August 25, 2003, Lavonne Fox, Psy. D., an Agency psychological expert, completed a Psychiatric Review Technique, and noted that Plaintiff suffered depression, anxiety, and a "probable" personality disorder, but that those disorders had no more than a "moderate," that is, nondisabling, impact on her activities of daily living, social functioning, and abilities to concentrate or maintain persistence or pace in a work-like setting.

The same day, Dr. Fox completed a Mental Residual Functional Capacity Assessment, concluding that Plaintiff had a moderate restriction on her ability to carry out detailed instructions, to concentrate for extended periods, to accept instructions and criticism, to respond to changes in the

workplace, and to set realistic goals, but that she was able to understand and remember simple directions, to concentrate and adapt to changes in work settings sufficiently to complete simple, routine, repetitive tasks, and to maintain adequate relationships with others. In support of these conclusions, Dr. Fox noted that the Plaintiff's medical chart showed that Plaintiff had "lots of friends" who would "come over" to the Plaintiff's home for meals and conversation; and that Plaintiff did the household grocery shopping, enjoyed cross-stitching, and attended church.

The parties have not assigned error to the ALJ's recitation of the medical records (presented to the ALJ at or after the hearing). Moreover, the undersigned has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> There is no documentation of any treatment for depression or any other mental impairment prior to December 31, 2003. The only evidence of her depression prior to this date is a consultative psychiatric evaluation that was performed on August 2, 2003. At the time, the claimant presented with good grooming and hygiene, was cooperative. She described difficulty with anxiety, depression, and difficulty with issues of control that she described as "chronic compulsive disorder." She said she last worked several years ago due to her psychiatric problems and difficulty with her shoulder. She said she had never been hospitalized for psychiatric reasons and never had any outpatient psychiatric therapy. She was taking Wellbutrin SR 150 and felt it helped somewhat. Upon mental status exam, the claimant was cooperative, had no gross abnormality of reality contact, motor activity, motivation, or reliability of impulse control. She had no evidence of formal thought disorder. She rated herself as moderately depressed "only when I can't accomplish my goals for the day." She denied suicidal ideation presently. She was able to do calculations, spell the word "world" and "bread" backwards, recalled 2 out of 3 items in 3 minutes, recall 6 digits backwards and 7 forward. She appeared to have average intellect. Concentration and attention appeared to be mildly impaired if at all. It was the impression she had depressive disorder, NOS; generalized anxiety disorder; rule out obsessive-compulsive disorder; probable mixed personality disorder with obsessive-compulsive and dependent features. Her prognosis was fair at best even with appropriate treatment (Exhibit 3F). Per the "B" criteria, the evidence suggests that the claimant's depression causes only mild restriction of activities of daily living with her reporting doing light chores, taking care of own personal activities of daily living and watched some TV. She has evidence of mild difficulty maintaining social functioning. She said she

seldom visited with family or friends, but said she got along with others and did so while working. She has evidence of mild difficulties maintaining concentration, persistence or pace. She demonstrated intact memory during psychiatric evaluation, was able to do calculations, spell words backwards, recall 2 out of 3 objects, etc. and it was stated she had mild impairment of concentration and attention, if at all (Exhibit 3F). There is no documentation of any episodes of decompensation and there is no evidence for the "C" criteria. Based on the foregoing evidence, the undersigned finds that the claimant's depression is nonsevere.

The record documents that the claimant's brachial plexus syndrome of right arm and fibromyalgia were severe prior to the date her insured status expired, but the evidence does not document that either of these impairments was at a disabling level of severity or caused significant work-related functional limitations. Jonathan B. Woods, M. D., conducted a disability examination on July 26, 2003. At the time, the claimant complained of low-winged scapula and said she had Lyme's disease in 1995 which affected a nerve in her back. She reported difficulty with her arm with difficulty lifting or pushing things overhead. She said she last worked as a secretary but had to quit because she could not use her right arm. She was able to dress and feed herself, could stand for 30 minutes at a time and walk about a mile. She said she could only sit for 15 minutes due to hip pain. She said she could not lift anything with her right arm, but her left arm was normal. She was able to drive a car and do such household chores as sweeping, mopping, vacuuming and cooking. However, said she could not always perform these chores due to arm pain. Upon examination, the claimant was 68 inches tall and weighed 232 pounds. She was well developed and nourished and in no acute distress. She ambulated well and got on and off the examining table with difficulty but had no problems getting out of chair. Her extremities showed no clubbing, cyanosis or edema and her gait was normal. Her grip strength was 5/5 bilaterally with normal fine and gross manipulations, normal finger-to-thumb apposition and she demonstrated normal range of motion of her elbow, spine, and wrist. Her shoulder forward elevation was normal bilaterally at 160 degrees, backward extension 40 degrees, abduction 90 on the right and 170 on the left, internal rotation 80 on the right and left, external rotation 60 degrees on right and left. Range of motion was normal of cervical and lumbar spine. Straight leg raising (SLR) was negative. She was able to lie straight back on the table, stand on her heels and toes, squat, rise and tandem walk. Motor strength was 5/5 in all muscle groups except for triceps which was 4. Sensory was grossly intact. Romberg was normal, cranial nerves were intact and deep tendon reflexes were 3+. It was the impression she had winged scapula with some limitations of range of motion, particularly abduction, but Dr. Woods said this would not significantly affect her in a secretarial job. He felt there were many tasks she could perform and had no significant other limitations. He felt she had arthritis in her hips without limitation of strength or range of motion testing (Exhibit IF).

Treatment notes from the claimant's primary care physician, John R. Marchese, M. D. covering period from April 12, 2000 through March 31, 2004, note as of April 12,

2000 she was doing well except for some anxiety spells and mild depression, primarily due to problems with her oldest child. On March 25, 2002, she was switched from Prozac to Wellbutrin and on May 11, 2003 was put on Wellbutrin SR 150. On March 31, 2004, it was noted that she had some symptoms very suggestive of arthritis, possibly degenerative type. Dr. Marchese completed a physical capacities evaluation form assessing the claimant was capable of sitting, standing or walking one hour in an 8-hour work day; occasionally lifting/carrying up to 20 pounds; she could not use her hands for simple grasping, pushing/pulling or fine manipulation or use her feet for repetitive movements as in operating foot controls; she was not able to squat, crawl or climb and could occasionally bend or reach above shoulder level. She had mild restriction of exposure to unprotected heights or driving automotive equipment. It was noted the claimant had the following: hypothyroidism, fibromyalgia, depression, degenerative arthritis, abnormal liver function and marked fatigue. Dr. Marchese opined the claimant had moderate and frequent pain (Exhibit 8F).

Records from Wilkes Surgical Associates for period May 8, 2000 through May 17, 2004, reflect the claimant presented on September 19, 2003 complaining of continued back pain for many years. She said she contracted Lyme's disease about 7 years ago and that it settled into her *CI,* 8 and Tl, 2 nerve root and she had been having a lot of shoulder pain as well. She said it was better but she still had a lot of pain and could do not any work whatsoever without the right arm becoming weak and she could not hold onto things in the evening. Examination revealed obvious muscle atrophy of supra spinatus muscle secondary to nerve difficulty. She had difficulty with abduction on the right but reflexes were intact at elbow and wrist. There were no carpal tunnel problems whatsoever. It was assessed she had neuropathy of right C8, Tl, 2 distribution. On November 4, 2003, it was noted the carpal tunnel test showed mild CTS of wrist. She was rechecked on November 7, 2003 for peripheral neuropathy of thoracic right shoulder. Nerve conduction test confirmed diagnosis of neuropathy and she had no improvement. Neurontin was prescribed. She returned on November 21, 2003 for recheck of her brachial plexus syndrome and neuritis of left shoulder. She had residual tenderness and said Neurontin 300 mg., did not really help at all. It was increased to 600 mg. She was not interested in going to physical therapy (PT) or water aerobics or having any other thing done of this nature. Upon follow-up on December 12, 2003, it was noted she had side effects on 1200 mgs of Neurontin and went off it. The pain in her legs returned and she went back on 300 mg. and it helped immensely. She was getting good response with 300 mg. at bedtime. As such, she was to be kept on this dosage for an indefinite period of time. She was applying for disability. Upon examination on May 17, 2004, the claimant still had some muscle atrophy particularly in the right supraspinatus region and rhomboid area of the shoulder. She had extreme pain particularly when she tried to overdo it or perform daily activities and was unable to do them. It was stated, "She probably has some aspects of fibromyalgia associated with this brachial plexus injury, but at this point in time she has probably reached maximum medical improvement." (Exhibit 9F).

Treatment notes from Wake Forest University Baptist Medical Center covering period from July 22, 1996 through July 28, 2004, reflect she had a tick bite with onset of migratory arthralgias and had some atrophy of supraspinatus and obvious winging with push ups, but negative Spurling's and Tinel's over brachial plexus. She had no atrophy or wasting of paraspinal muscles. It was assessed she had suprascapular nerve palsy of unknown etiology. EMG study on August 13, 1996 was most compatible with an isolated right long thoracic mononeuropathy most likely due to stretch injury. MRI of upper extremity showed normal exam of brachial plexus and small supraclavicular nodes. It was stated on September 13, 1996 that she had no evidence of cervical radiculopathy or brachial plexopathy. She returned on June 27, 2003 (several years later) reporting decrease in energy level, but examination was unremarkable and etiology of her complaints was unknown. It was later assessed that she had hypothyroidism secondary to radioactive iodine therapy and was on Levoxyl for this condition. On June 10, 2004, it was noted that her thyroid test was perfect meaning she was on the correct dose of Levoxyl. She continued to complain of chronic fatigue and little energy, but she seemed to have a significant component of anxiety as well as a number of other non-specific symptoms and it was doubted that her symptomatology was thyroid-related. She presented on July 28, 2004 for evaluation of pain symptoms, possibly fibromyalgia. She reported a progressive 7-8 year history of progressive problems with pain and fatigue. It was noted that activity could worsen her symptoms and she related her leg muscles hurting after riding a bike with some subjective dyspnea. She said swimming aggravated her back pain. She said she had PT in the past for her back, but not on a regular basis and did not do any regular stretching or strengthening exercises for her back. She said she took acetaminophen PM which definitely helped her pain and sleep in the past, but stopped it due to concerns of potential liver problems; however, she had never been told of abnormal liver tests. Upon physical examination at this time, she had muscular tender points in the paracervical regions, lower costosternal regions, right lateral epicondylar and trochanteric regions. In upper extremities, she had very small Heberden's and Bouchard's nodes in DIP and PIP finger joints but none in upper extremity joints and no significant reduced range of motion or joint line tenderness, warmth, effusion or synovitis. Lower extremity range of motion was full and painless. Strength was 5/5 and gait was normal. It was the impression the claimant had diffuse myalgias, tender points and fatigue symptoms, most consistent with diagnosis of fibromyalgia; mild nodal OA of the fingers, asymptomatic; treated hypothyroidism with subsequent hypothyroid controlled with Levoxyl. Conservative treatment with PT and aerobic level exercise as well as use of medication such as acetaminophen or trials of other medications such as Ultram was suggested (Exhibit 13F).

Dr. Bond of Wilkes Surgical completed a Physical Capacities Evaluation form on May 24, 2004 assessing the claimant was capable of sitting, standing or walking 4 hours in an 8-hour workday; she could never lift/carry any amount of weight; could not use right upper extremity for push/pull; she could not crawl, climb or reach above shoulder level; occasionally squat and frequently bend; mild restriction of exposure

to marked changes in temperature or humidity or driving automotive equipment. Dr. Bond stated she had signs of muscle spasm and numbness in right arm and moderate to severe pain in right arm (Exhibit 14F).

On May 19, 2005, the claimant presented as a new patient to Michelle Redman, M. D. with history of hypothyroidism and complaining of difficulty with increased fatigue throughout the day. Examination was unremarkable. The claimant was told on May 25, 2005 that laboratory results showed normal CBC, normal thyroid studies, normal liver tests, and sodium, potassium and glucose were all normal. Examination on July 25, 2005 showed the claimant to be alert and oriented times 3 with 5/5 motor strength in upper and lower extremities and normal gait. On September 7, 2005, it was noted that the claimant had complete neurologic workup including EMG and nerve conduction studies that were essentially non-diagnostic. She continued to complain of profound weakness, shortness of breath, and palpations associated with physical activity such as climbing stairs. It was assessed she had fibromyalgia. She discontinued Wellbutrin herself 2 weeks ago. She was started on Cymbalta. She was noted to have shortness of breath/palpitations and eye blindness. Exercise echo with spectral Doppler was normal showing normal left ventricular function and ejection fraction of 58%. MRI scan of the brain was within normal limits (Exhibit 10F).

(Tr. 20-23.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that the Plaintiff appeals.

### III.  STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was therefore whether the Plaintiff became "disabled" as that term of art is defined for Social Security purposes before the expiration of her insured status on

10

December 31, 2003.[1] It is not enough for a claimant to show that she suffered from severe medical conditions or impairments which later became disabling; rather, the subject medical conditions must have become disabling prior to the date last insured. Harrah v. Richardson, 446 F.2d 1, 2 (4th Cir. 1971) (no "manifest error in the record of the prior administrative proceedings" where Plaintiff's conditions did not become disabling until after the expiration of his insured status).

The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision; that the Plaintiff suffered "brachial plexis syndrome-right arm" and fibromyalgia, which were severe impairments within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff was unable to perform her past relevant work; that Plaintiff was able to respond appropriately to supervision, co-workers and the public and to routine work situations and decisions; that the Plaintiff had the residual functional capacity for light work[2] not requiring more than frequent standing, fingering, reaching or pushing/pulling or more than

---

[1] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

[2] "Light" work is defined in 20 C.F.R. § 404.1567(b) as follows:
Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

"limited" climbing, crouching or crawling, and that consisted of performing simple repetitive tasks with normal breaks every two hours; and that the Plaintiff was a "younger individual" with "more than a high school education."

After noting that Medical-Vocational Rule 202.22 would require a finding of "not disabled" for a person of comparable age and education who could perform a "full range" of light work, the ALJ then correctly shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on hypotheticals that factored in the limitations discussed above, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform, specifically, the cashier and mail clerk jobs, and that, therefore, she was <u>not</u> disabled.

The Plaintiff essentially appeals the ALJ's alleged failure to fully develop the record, and subsequent determination of her residual functional capacity ("RFC"). <u>See</u> Plaintiff's "Motion for Summary Judgment" (document #12) and "Memorandum in Support" (document #13). Concerning the first point, the undersigned finds that the ALJ adequately developed the record. Indeed, a review of the hearing transcript reveals that the ALJ extensively questioned Plaintiff about the physical and mental demands of her past work (Tr. 43-45, 59-60), her depression and other alleged mental impairments, her shoulder problems, her right arm weakness, and her hyperthyroidism (Tr. 43, 47, 51, 56-57, 60-62, 67-68, 70), and the onset, symptoms, treatment and aggravating factors relative to Plaintiff's physical and mental impairments, as well as the effects of her impairments on her ability to work. (Tr. 45-52, 54-60, 70).

Moreover, there is substantial evidence supporting the ALJ's finding concerning the Plaintiff's residual functional capacity, which Social Security Regulations define as "what [a

claimant] can still do despite h[er] limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Relying on evidence in the medical record, Agency medical evaluators found that Plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds; that she could sit, stand, and/or walk 6 hours in an 8-hour workday; that her ability to push and/or pull was unlimited; and that the Plaintiff had no nonexertional limitations other than avoiding repetitive overhead reaching and otherwise had a residual functional capacity for medium work. An Agency psychological evaluator, Dr. Fox, found that Plaintiffs alleged mental and emotional impairments had, at most, a moderate, nondisabling impact on the Plaintiff's ability to work.

The ALJ found the Plaintiff not disabled, however, based on a residual functional capacity for light work consisting of simple, repetitive tasks, permitting normal beaks, and not requiring more than frequent standing, fingering, reaching or pushing/pulling or more than "limited" climbing, crouching or crawling. In other words, the ALJ concluded that the Plaintiff had a <u>lower</u> residual functional capacity than reviewing experts concluded was supported by the objective medical record, including making a significant allowance for the Plaintiff's shoulder pain and weakness and difficulty concentrating.

Although the Plaintiff has not assigned error to the ALJ's decision not to give controlling weight to the physical functional capacity evaluations completed by Dr. Bond and Dr. Marchese, she does argue that these evaluations, which were not completed until three months after her date last

13

insured, support her contention that she could not perform light work.[3]  As the ALJ noted, the opinions of Drs. Bond and Marchese were out of proportion to their objective medical findings and appeared to be based on Plaintiff's subjective allegations. Indeed, Dr. Bond's treatment notes contain few examination findings and largely memorialize Plaintiff's subjective statements (Tr. 206-209). Although one examination revealed muscle atrophy of the right supra spinatus muscle and difficulty with right shoulder abduction, the remaining entries do not include any reference to findings made upon examination but instead, merely recount Plaintiff's reports of her symptoms.

Dr. Marchese's treatment notes similarly lack objective medical findings in support of his assessed restrictions. Dr. Marchese served as Plaintiff's primary care physician with only annual examinations in 2000, 2002 and 2004. In 2003, Dr. Marchese referenced Plaintiff's thyroid condition and certain laboratory results, but this condition was monitored and successfully treated by physicians at Wake Forest University Baptist Medical Center. Dr. Marchese also noted Plaintiff's complaints of depression and prescribed an antidepressant medication, but there is no evidence that he provided mental health treatment to Plaintiff. In short, nothing in Dr. Marchese's treatment notes, with the exception of Plaintiff's subjective statements, supports the limitations he placed on Plaintiff's physical capacities, but a plaintiff's statements alone are not sufficient to establish the presence or severity of a physical or mental impairment. See 20 C.F.R. § 404.1528(a).

---

[3]Even if the Plaintiff had made such an assignment of error, the Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

The ALJ's RFC findings were fully supported by the consultative examination performed by Dr. Woods on July 26, 2003, only five months prior to Plaintiff's date last insured. The Plaintiff reported that she was able to dress and feed herself, that she could stand for 30 minutes at a time and walk about a mile, and that she was able to drive a car and do such household chores as sweeping, mopping, vacuuming and cooking. An examination revealed that Plaintiff was not in acute distress; that she ambulated well and had no problems getting out of a chair; that her extremities showed no clubbing, cyanosis or edema and her gait was normal; that her grip strength was "5/5" (normal) bilaterally with normal fine and gross manipulations and normal finger-to-thumb apposition; and that she demonstrated normal range of motion of her elbow, spine, and wrist. Plaintiff's shoulder forward elevation was normal bilaterally at 160 degrees, backward extension 40 degrees, abduction 90 on the right and 170 on the left, internal rotation 80 on the right and left, external rotation 60 degrees on right and left. Plaintiff's motor strength was 5/5 in all muscle groups except for triceps which was 4. Dr. Woods diagnosed winged scapula with some limitations of range of motion, particularly abduction, but he did not believe this would significantly affect Plaintiff in a secretarial or other light job. Instead, Dr. Woods opined that there were many tasks the Plaintiff could perform and that she had no other significant limitations.

The Plaintiff also admitted at the hearing that she was taking only moderate amounts of over the counter medication to control her pain. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

The record also establishes that the Plaintiff engaged in significant daily life activities, such as bathing and dressing herself, caring for her daughters, performing a moderate level of household chores, driving, grocery shopping, cooking for friends, and attending her daughters' school meetings and church regularly. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work" which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by nonexertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to

alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's "brachial plexis syndrome-right arm" and fibromyalgia – which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in <u>Craig</u>. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." <u>Mickles</u>, 29 F.3d at 921, citing <u>Hunter v. Sullivan</u>, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on a moderate level of daily activities, that is, Plaintiff's ability to take care of her personal needs, to perform some household chores, to care for her daughters, to drive and go shopping, and to attend church, as well as the objective evidence in the medical record, discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." <u>Seacrist v. Weinberger</u>, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by

her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion For Summary Judgment" (document #11) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #13) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Page v. Lee, 337 F.3d 411, 416 n.3 (4th Cir. 2003); Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court. Diamond v. Colonial Life, 416 F.3d 310, 315-16 (4th Cir. 2005); Wells v. Shriners Hosp., 109 F.3d 198, 201 (4th Cir. 1997); Snyder, 889 F.2d at 1365. Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal. Diamond, 416 F.3d at 316; Wells, 109

F.3d at 201; Page, 337 F.3d at 416 n.3; Thomas v. Arn, 474 U.S. 140, 147 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Richard L. Voorhees.

**SO RECOMMENDED AND ORDERED.**

Signed: November 27, 2006

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge